# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# ASHEVILLE DIVISION
# 1:17cr14

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | MEMORANDUM AND |
| ) | RECOMMENDATION |
| JOSHUA PAUL PARKS, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**THIS MATTER** is before the Court upon Defendant's Motion to Suppress and Request for an Evidentiary Hearing (# 12). The undersigned conducted an evidentiary hearing on August 10, 2017, and heard evidence from both the Government and Defendant. Having carefully considered the evidence, briefs, and arguments of counsel, the Court enters the following findings, conclusions, and recommendation.

## FINDINGS AND CONCLUSIONS

### I. Procedural Background

On February 8, 2017, a grand jury returned a single-count Bill of Indictment (# 1) charging Defendant with being a felon in possession of a firearm and ammunition, that is a Davis Industries, Model D-32, .32 caliber handgun, all in violation of Title 18, United States Code, Section 922(g)(1).

On May 10, 2017, Defendant filed the instant Motion to Suppress and Request for an Evidentiary Hearing (# 12), in which he moves to suppress the evidence found in violation of his Fourth Amendment rights and requests an evidentiary hearing. On May 23, 2017, the Government filed a Response (# 16) in opposition.

Defendant's request for an evidentiary hearing was granted, and on August 10, 2017, the Court held an evidentiary hearing. At the conclusion of the evidentiary hearing, and at the request of Defendant, the Court allowed the parties to file additional briefing rather than argue at the hearing. The Government and Defendant both filed post-hearing briefs (# 24, 25).

## II. Factual Background

The facts, as deduced at the hearing before the undersigned, are as follows:[1] On June 22, 2016, Detective James Mode ("Mode") and Detective Josh McCraw ("McCraw") were conducting surveillance on Painters Gap Road, an area in the Western District of North Carolina. (Hr'g Tr. 10-11, 91, Aug. 10, 2017.) The detectives had received information about possible narcotics in the area, and their investigation involved methamphetamine trafficking. (Hr'g Tr. 11, 91, Aug. 10, 2017.)

Detectives Mode and McCraw saw a vehicle at a residence believed to be associated with narcotics trafficking. (Hr'g Tr. 11, Aug. 10, 2017.) The vehicle had been staying on Lawing Mill Road. (Hr'g Tr. 11, Aug.10, 2017.) Detectives Mode and McCraw drove to the Welcome Home Baptist Church and pulled into the parking lot across the road from the church. (Hr'g Tr. 11-12, Aug. 10, 2017, Gov's Ex. 1.) This location provided a vantage point of the roadway. (Hr'g Tr. 12, Aug. 10, 2017.)

A Dodge Dart drove by, which appeared to be the same vehicle that had been sitting at both Lawing Mill Road and another location where information had been received about narcotics trafficking. (Hr'g Tr. 12, Aug. 10, 2017.) At the time, Detective Mode did not know to whom the

---

[1] At the outset of the hearing, the Government advised the Court that it was not going to be putting on evidence in defense of the K-9 drug dog. (Hr'g Tr. 4, Aug. 10, 2017.) In fact, the Government explained that it wished to rely on the arguments raised in its Response to the motion to suppress. (Hr'g Tr. 6, Aug. 10, 2017.) The Government conceded that there were no drugs found in the car. (Hr'g Tr. 144-46, Aug. 10, 2017.) The Government also admitted that the search was not supported by the K-9 drug dog. (Hr'g Tr. 145, Aug. 10, 2017.)

2

vehicle was registered. (Hr'g Tr. 13-14, Aug. 10, 2017.) Detectives Mode and McCraw decided to follow the vehicle along Painters Gap Road to attempt to identify both the vehicle and its occupants.[2] (Hr'g Tr. 13, Aug. 10, 2017.) The detectives did not take video footage as they followed the Dodge Dart. (Hr'g Tr. 68, Aug. 10, 2017.)

Painters Gap Road is a state-maintained road with curves and straightaways. (Hr'g Tr. 17-18, Aug. 10, 2017.) There is no paved shoulder on either side of the road. (Hr'g Tr. 64, Aug. 10, 2017.) The road has two lanes going in opposite directions. (Hr'g Tr. 17, Aug. 10, 2017.) The road also has yellow lines going down the middle of the road, fog lines on each side, and a speed limit of 55 m.p.h. (Hr'g Tr. 17, 18, Aug. 10, 2017.)

As detectives followed the Dodge Dart, which was going approximately 45 m.p.h., the vehicle crossed over the center line several times.[3] (Hr'g Tr. 14, 64, Aug. 10, 2017.) Detective Mode saw no road conditions requiring a driver to operate left of center. (Hr'g Tr. 18, Aug. 10, 2017.) At the time, Detective Mode had no idea who the occupants of the Dodge Dart were. (Hr'g Tr. 16, Aug. 10, 2017). The detectives decided to stop the vehicle around 2:25 p.m.[4] (Hr'g Tr. 15, 94, Aug. 10, 2017.)

Detective Mode turned on the blue lights to the cruiser and "bumped" his siren. (Hr'g Tr. 16, Aug. 10, 2017.) During the preliminary stop, the Dodge Dart stopped in the middle of the roadway on Painters Gap Road. (Hr'g Tr. 16, 97, Aug. 10, 2017.) Either Detective McCraw or Detective Mode exited the vehicle, went up to the Dodge Dart, and directed the driver to move the vehicle up the road a short distance to Brooks Lake Road.[5] (Hr'g Tr. 16, 95, Aug. 10, 2017.)

---

[2] Detective Mode testified that he and Detective McCraw followed the Dodge Dart for 4.8 miles, despite the fact that Detective Mode's report stated it was only approximately three miles. (Hr'g Tr.14, Aug. 10, 2017.)
[3] Detective Mode testified that the vehicle crossed left of center "continuously." (14). Detective McCraw testified that the Dodge Dart crossed the center line "multiple times." (Hr'g Tr. 93-94, Aug. 10, 2017.)
[4] Officer Mode explained that the times on his report were not accurate. (Hr'gTr. 14-15, Aug. 10, 2017.)
[5] Both Detective Mode and Detective McCraw testified that during the preliminary stop they personally approached the Dodge Dart. (Hr'g Tr. 16, 95, Aug. 10, 2017.)

Brooks Lane Road provided a safer location for the stop because there is more room on the side of the road. (Hr'g Tr. 17, Aug. 10, 2017.) The driver of the Dodge Dart did as directed and drove less than a half mile away and parked on Brooks Lane Road. (Hr'g Tr. 16, Aug. 10, 2017.)

On the actual stop of the Dodge Dart, Detectives Mode and McCraw both went up to the vehicle. (Hr'gTr. 22, Aug. 10, 2017.) Detective Mode approached the driver's side of the vehicle and Detective McCraw approached the passenger's side. (Hr'g Tr. 22, Aug. 10, 2017.) Detective Mode asked for identification, advised the driver who he was and the reason for the stop, and asked the passenger who he was. (Hr'g Tr. 22, Aug. 10, 2017.) The driver was identified as Matthew Hancock ("Hancock"), and the only passenger, seated in the front passenger seat, was identified as Joshua Paul Parks ("Defendant"). (Hr'g Tr. 23, Aug. 10, 2017.)

In light of Hancock's erratic driving, Detective Mode thought Hancock may have been drinking. (Hr'g Tr. 23, Aug. 10, 2017). Detective Mode asked Hancock to step out of the vehicle so he could assess his intoxication level. (Hr'g Tr. 24, 99, Aug. 10, 2017.) After talking with and observing Hancock, Detective Mode determined it was not necessary to perform any field sobriety tests. (Hr'g Tr. 24, 72, Aug. 10, 2017.)

Detective Mode gathered information from Hancock and Defendant and went back to his patrol car. (Hr'g Tr. 25, Aug. 10, 2017.) Detective Mode made a call to the communications center, but he didn't put much information over the radio because he didn't want to be overheard by scanners. (Hr'g Tr. 25, Aug. 10, 2017.) The Rutherford County Sheriff's Office created what is referred to as a "CAD report." (Gov's Ex. 2.) A CAD report is paperwork maintained by communications that shows what time law enforcement officers call in. (Hr'g Tr. 26, Aug. 10, 2017.) Detective Mode admitted that the information contained in the CAD report was consistent with his recollection. (Hr'g Tr. 33, Aug. 10, 2017, Gov's Ex. 2.)

Detective Mode used a program referred to as "CJLEADS" to get information about the occupants of the Dodge Dart. (Hr'g Tr. 34-35, Aug. 10, 2017.) CJLEADS allows law enforcement officers to obtain vehicle information, driver's license information, and offender information. (Hr'g Tr. 35, Aug. 10, 2017.) Detective Mode determined that the Dodge Dart was registered to Hancock. (Hr'g Tr. 36-37, Aug. 10, 2017.) There were no outstanding warrants for Hancock's arrest, but Defendant had an outstanding warrant for his arrest. (Hr'g Tr. 36, 38, Aug. 10, 2017, Gov's Ex. 3.) Detective Mode verified Defendant's outstanding warrant and arrested him. (Hr'g Tr. 38-39, 78, 80, Aug. 10, 2017, Gov.'s Ex. 3, 4, Def.'s Ex. 5.)

Next, Detective Mode called K-9 Officer Michael Snyder to the scene. (Hr'g Tr. 43, Aug. 10, 2017.) Once present at the scene, Detectives Mode and McCraw asked Officer Snyder to check the Dodge Dart to see if he could find the odor of narcotics. (Hr'g Tr. 52, Aug. 10, 2017). Hancock and Defendant were outside the Dodge Dart when the dog was used. (Hr'g Tr. 52, Aug. 10, 2017.) Officer Snyder informed Detective Mode that the K-9 had alerted on the vehicle. (Hr'g Tr. 52, Aug. 10, 2017.)

The Dodge Dart was searched by Officer Snyder and Detective McCraw. (Hr'g Tr. 104, 116, 18, Aug. 10, 2017.) A handgun was discovered under the front passenger's seat, where Defendant had been seated. (Hr'g Tr. 53, 104, 118, Aug. 10, 2017; Gov's Ex. 6.) Detective Mode did not recall asking Hancock to consent to extend the stop. (Hr'g Tr. 82, Aug. 10, 2017.) In an attempt to cooperate, Defendant stated that he wanted to talk to law enforcement about a drug case they were investigating. (Hr'g Tr. 56, Aug. 10, 2017.)

At 2:25 p.m., Detective Mode started writing a warning citation for Hancock. (Hr'g Tr. 44, 75, Aug. 10, 2017; Gov's Ex. 5.) The citation was based on failure to maintain lane and driving left of center, which are both violations of the North Carolina General Statutes. (Hr'g Tr. 48, Aug.

10, 2017; Gov's Ex. 5.) Hancock was given the warning citation and allowed to leave the scene. (Hr'g Tr. 84, Aug. 10, 2017.)

Defendant was taken into custody and placed in Officer Snyder's vehicle. (Hr'g Tr. 84, Aug. 10, 2017.) Because Defendant stated he could provide information on a subject law enforcement was investigating, he was taken to the Rutherford County Forensics Building for questioning. (Hr'g Tr. 85, Aug. 10, 2017.) Sergeant Chadd Murray ("Murray") conducted the interview, and Detective Mode was present. (Hr'g Tr. 85, Aug. 10, 2017.) Defendant admitted that the gun discovered in the Dodge Dart was his, and he purchased the gun from Jimmy Nodine for $75. (Hr'g Tr. 87, Aug. 10, 2017.)

Around 2:50 p.m., Sergeant Murray, a Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") task force officer, was contacted. (Hr'g Tr. 112, 132-33, Aug. 10, 2017.) Sergeant Murray is sergeant over the Narcotics Unit of the Rutherford County Sheriff's Office and also serves as supervisor for Detectives Mode and McCraw. (Hr'g Tr. 131-32, Aug.10, 2017.) Detective Mode informed Sergeant Murray that Defendant wanted an interview about a drug trafficking case that they were working on. (Hr'g Tr. 132, Aug. 10, 2017.) Sergeant Murray informed Detective Mode that he would be glad to talk with Defendant. (Hr'g Tr. 133, Aug. 10, 2017.)

Sergeant Murray was at the Forensics Building when Defendant arrived. (Hr'g Tr. 134, Aug. 10, 2017.) Once the audio and video recording were set up, Defendant went in to the interview room with Sergeant Murray and Detective Mode. (Hr'g Tr. 134, Aug. 10, 2017.) At 3:14 p.m., Defendant was read his Miranda rights from a form. (Hr'g Tr. 134-36, Aug. 10, 2017; Gov.'s Ex. 7.) Defendant indicated that he understood his rights and wanted to speak with law enforcement. (Hr'g Tr. 136-37, Aug. 10, 2017; Gov.'s Ex. 7). Defendant admitted that he initially

lied about the firearm not being his and claimed ownership of the firearm. (Hr'g Tr. 138, Aug. 10, 2017). Defendant also provided information regarding another investigation. (Hr'g Tr. 138, Aug. 10, 2017.) Defendant was given a $75,000 unsecured bond. (Hr'g Tr. 139, Aug. 10, 2017.)

James Allard ("Allard"), an employee of the Federal Public Defenders Office in the Western District of North Carolina, was asked to videotape the route that law enforcement would have taken to follow the Dodge Dart on June 22, 2016. (Hr'g Tr. 147-48, Aug. 10, 2017.) At 9:41 a.m. on May 17, 2017, Allard went out to the location to get a view of the route and record it. (Hr'g Tr. 149, Aug. 10, 2017.) Allard set up an iPhone 6 on the dashboard of his car and recorded the route as he thought it to be. (Hr'g Tr. 149-50, Aug. 10, 2017.) Allard downloaded the information onto CD drives and a thumb drive. (Hr'g Tr. 152, Aug. 10, 2017; Def.'s Ex. 3.)

**III.    Discussion**

Defendant argues that law enforcement violated his Fourth Amendment rights in two respects. Def.'s Br. Supp. (# 24) at 1. First, Defendant contends that he was unconstitutionally seized when law enforcement initiated a traffic stop without probable cause. Id. Second, Defendant contends that law enforcement did not have reasonable suspicion to extend the traffic stop to conduct a drug investigation. Id.

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. The exclusionary rule serves as "a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." Davis v. United States, 564 U.S. 29, 231-32 (2011). The exclusive purpose of the exclusionary rule "is to deter future Fourth Amendment violations. Id. at 236-37. "When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." Id. at 238 (internal quotations

7

omitted).

### A. Detectives Mode and McCraw had probable cause to justify the traffic stop.

Initially, Defendant argues that the detectives lacked probable cause to stop Hancock because the road being traveled was narrow and winding, there was no shoulder, there were changes in elevation, and the weather conditions in nearby Rutherfordton were reportedly windy with gust speeds of 17.3 miles per hour. Def.'s Br. Supp. (# 24) at 4-5. Defendant concludes that it is common sense under the conditions that a driver may need to avoid the right edge of the road and cross over the center at times. Id. at 4-5. Defendant further argues that the testimony from Detectives Mode and McCraw was "inconsistent" regarding the Dodge Dart's crossing of the center line. Id. at 4.

When law enforcement stops a vehicle and detains an occupant, the stop constitutes a "seizure" that implicates the Fourth Amendment. Brendlin v. California, 551 U.S. 249, 55 (2007). Because a vehicular stop is a "seizure" under the Fourth Amendment, it must be "reasonable" under the circumstances. United States v. Palmer, 820 F.3d 640, 648 (4th Cir. 2016). "[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." United States v. Wren, 517 U.S. 806, 810 (1996).

At the outset, the Court notes there was absolutely no evidence presented during the evidentiary hearing to support Defendant's assertion that there were gusty wind speeds of 17.3 miles per hour in the area of the traffic stop. Detective Mode specifically testified that he was not aware of any road conditions that would have required the driver of the Dodge Dart to cross the center line. (Hr'g Tr. 18, Aug. 10, 2017.) Moreover, Defendant placed a video into evidence at the evidentiary hearing that goes along the same route traveled on the afternoon of June 22, 2016. The video, however, shows a generally unremarkable two-lane North Carolina highway.

Moreover, Defendant's attempt to add evidence post-hearing, without any represented basis for doing so, must fail.

Defendant relies on United States v. Gregory, 79 F.3d 973 (10th Cir.1996) to support the proposition that because "[t]he road was winding, the terrain mountainous and the weather condition was windy. Under these conditions any vehicle could be subject to an isolated incident of moving into the right shoulder of the roadway, without giving rise to a suspicion of criminal activity." Defendant's reliance on Gregory must fail because the cases are factually distinguishable. In Gregory, the Tenth Circuit concluded that one instance of a car crossing into the emergency lane was not a Utah traffic violation. In the instant case, however, the vehicle crossed the center line multiple times. (Hr'g Tr. 14, 93-94, Aug. 10, 2017.)

Finally, the Court finds that testimony from Detectives Mode and McCraw, on the issue of the number of times that the Dodge Dart crossed the center line, was not "inconsistent." Detective Mode testified that the vehicle crossed left of center "continuously" (Hr'g Tr. 14, Aug. 10, 2017), and Detective McCraw testified that the vehicle crossed the center line "multiple times" (Hr'g Tr. 93-94, Aug. 10, 2017). The terms "continuously" and "multiple" are not mutually exclusive. The importance of both detectives' testimony is that the Dodge Dart crossed the center line on at least multiple occasions. Thus, Hancock committed a traffic violation and also caused the detectives to fear that he was operating the vehicle under the influence of alcohol.

**B. Detectives Mode and McCraw had reasonable suspicion to prolong the stop.**

Next, Defendant argues that even if traffic stop was justified at its inception, the continued seizure of Defendant without reasonable suspicion violated the Fourth Amendment. Def.'s Br. Supp. (# 24) at 5. Citing Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015), Defendant contends that he and Hancock were unlawfully seized when officers added time to the traffic stop

9

without reasonable suspicion of criminal activity or consent. Id. Defendant concludes that the detectives' actions were not reasonably related in scope to the basis for the traffic stop, and Defendants' prolonged seizure during the traffic stop violated his Fourth Amendment rights. Id. at 6.

When a traffic stop is extended beyond the time period that the officer is completing tasks related to the traffic stop, the officer must either obtain consent from the detained individual or identify reasonable suspicion of criminal activity to support the extension of the time. United States v. Williams, 808 F.3d 238, 245-46 (4th Cir. 2015). "The maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision. Instead, the appropriate constitutional inquiry is whether the detention lasted longer than was necessary, given its purpose." United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008)

Each detective's testimony was not exact with respect to the time, but a close review of the evidentiary hearing transcript testimony reveals the following: The initial call to communications was made at 2:12 p.m. (Hr'g Tr. 139, Aug. 10, 2017.) The call to communications ended at 2:51 p.m. (Hr'g Tr. 139, Aug. 10, 2017.) Therefore, in 39 minutes, each of the following occurred: the Dodge Dart was stopped, Detective Mode approached the Dart and assessed Hancock for possible alcohol intoxication, Detective Mode went back to his patrol car to obtain additional information on the occupants of the Dodge Dart, Detective Mode determined that Hancock did not have any outstanding warrants, Detective Mode determined that Defendant had an outstanding warrant, Detective Mode wrote out a handwritten warning citation for Hancock, Defendant's outstanding arrest warrant was verified, Defendant was arrested based on the warrant, Officer Snyder and the K-9 arrived on the scene, Officer Snyder and the K-9 checked the vehicle, and Officer Snyder and Detective McCraw conducted a search of the Dodge Dart. 140.

The Court finds no evidence in the record that the traffic stop lasted longer than necessary. Moreover, Sergeant Murray, a law enforcement officer with over 15 years of experience in law enforcement, testified at the evidentiary hearing that in light of all that Detectives Mode and McCraw accomplished, it did not appear they were intentionally delaying the process. (Hr'g Tr. 139, Aug. 10, 2017.)

## RECOMMENDATION

**IT IS THEREFORE, RESPECTFULLY RECOMMENDED** that Defendant's Motion to Suppress and Request for an Evidentiary Hearing (# 12) be **DENIED**.

Signed: November 14, 2017

Dennis L. Howell
United States Magistrate Judge

## **Time for Objections**

The parties are hereby advised that, pursuant to Title 28, United States Code, Section 636(b)(1)(C), and Rule 72 of the Federal Rules of Civil Procedure, written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen** (**14**) days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the presiding District Judge will preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).